```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

WILLIAM ZANES,                           :
                                         :     HONORABLE JOSEPH E. IRENAS
            Plaintiff,                   :
                                         :     CIVIL ACTION NO. 05-2288 (JEI)
      v.                                 :
                                         :
FAIRFIELD COMMUNITIES, INC.;             :            **OPINION**
CENDANT CORPORATION; and                 :
MICHAEL WALKER,                          :
                                         :
            Defendants.                  :

**APPEARANCES:**

VAN SYOC CHARTERED
By: Clifford L. Van Syoc, Esq.
Tara Professional Park
401 South Kings Highway, Building 1
Cherry Hill, New Jersey 08034
        Counsel for Plaintiff

DAY PITNEY
By: Michael T. Bissinger, Esq.
P.O. Box 1945
Morristown, New Jersey 07962
        Counsel for Defendants

**IRENAS**, Senior District Judge:

   This is a retaliatory discharge suit filed by William "Bill" Zanes, against his former employer, Fairfield Communities, Inc. ("Fairfield"), disputed former employer, Cendant Corporation ("Cendant"), and Michael Walker, his former supervisor.  Zanes asserts that he was wrongfully transferred and then terminated from his position after he complained to management about his employer's alleged racially discriminatory marketing practices.[1]  He primarily

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

asserts claims under New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 et. seq., and Law Against Discrimination ("LAD"), N.J.S.A. 10-5:1 et. seq., and also asserts a defamation claim. Defendants move for summary judgment. For the reasons stated herein, the Motion will be granted in part and denied in part.

**I.**

Plaintiff Zanes was employed as a "Commission Marketing Professional," or "CMP," with Fairfield for approximately one year-from April 2003, to May 14, 2004, when he was fired. (Zanes Dep. p. 31-32) Working inside various Trump properties in Atlantic City, Zanes was employed to market Fairfield timeshare vacations by recruiting potential customers.[2] (Id. at 55) Zanes' job was to persuade potential customers to take a tour of the Fairfield resort to learn about available timeshares. (Id.)

During the first four months of Zanes' employment, all CMPs rotated sites, working at either Trump Taj Mahal, Trump Plaza, or Trump Marina, depending on the shift to which they were assigned. (Zanes Dep. p. 45, 49, 66) Then Fairfield changed the site/shift assignment process, which resulted in Zanes working most of his shifts at the Taj Mahal. (Id. at 66) Zanes was pleased with the

---

[2] Fairfield and the Trump organization had a proprietary agreement, the specific terms of which are not disclosed in the record. (Walker Dep. p. 83-85) Suffice it to say, Fairfield employees were marketing timeshares inside Trump properties in Atlantic City with Trump's permission.

change in policy, because he had the best success rate when he worked at the Taj Mahal, as opposed to the other locations. (Id. at 50)[3]

During the course of Zanes' employment, Fairfield held various training sessions and meetings where management instructed CMPs (including Zanes) about people whom management determined to be the most desirable to solicit and how to describe the tour. At various meetings and training sessions, at least three management personnel instructed Fairfield employees not to approach people of Asian or Indian descent, single males, non-U.S. citizens, and people who did not speak "perfect English." (Zanes Dep. p. 174-75, 187; Draughn Dep. p. 137-39) Specifically, Zanes testified that his supervisor told him that, at Defendant Walker's direction,[4] Zanes would not be paid for tours he booked if the potential customers were Asian or Indian. (Id. at 174) One of Zanes' supervisors, Janice Draughn, also testified,

> [W]e were told not to market Asians but I said well, hey, if they qualify, it's not in paper. If they are a couple and they got a credit card and meet the qualifications and it doesn't matter if they got a dot on their head or not. . . . it was like I'm not going to discriminate. . . . What they called dot heads came in, if they have a credit card, if they meet the other

---

[3] Both Zanes and one of his former supervisors, Janice Draughn, testified that Zanes was one of the more successful CMPs in terms of tours booked per hour and percentage of qualified participants. (Zanes Dep. p. 61, 128; Draughn Dep. p. 64, 68)

[4] Walker was Vice President for Marketing in Atlantic City. (Walker Cert. ¶ 1) It appears that Walker was a supervisor to Zanes' immediate supervisor, although there may have been intermediate supervisors in between. (Zanes Dep. p. 120; Walker Dep. p. 43-44)

3

>qualifications, then let them turn it around at the
>registration desk.

(Draughn Dep. p. 85)  Draughn further stated that she was instructed by management to avoid marketing timeshares to single men and non-U.S. citizens.  (Id. p. 83)

Zanes claims that he was instructed to lie to people who did not meet the company's qualifications to participate in the tour,[5] by telling them that the tour was completely full.  (Id. p. 158-59) Zanes felt these instructions were "wrong" and objected at the meetings saying, "I feel it's wrong and I'm not going to do it." (Id. at 168)[6]  Elaborating on what he meant, Zanes explained at his deposition,

>I think that everyone should have an equal chance to
>buy a timeshare, no matter what country you're from or
>your language, or whether you're black, white, Asian,
>Hispanic.  I thought it was wrong to say there were
>certain ethnicity [sic], or if I booked them I
>wouldn't get paid for it.  And honestly, I think it's
>wrong, lying to people.

(Id. at 163)

Zanes believes that Walker "wanted to find a way to get rid of [him]" because of his objections.  (Zanes Dep. p. 71-72, 126-27) Specifically, Zanes believes that he was transferred from his post at the Taj Mahal and then later fired because of his objections.

---

[5] For example, to qualify for the tour one must have a major credit card.  (Zanes Dep. p. 101) It appears from the record that whether or not a person was "qualified" for a tour was a different matter from whether that person was a customer deemed desirable by Fairfield's management.

[6] Janice Draughn testified that Zanes complained to her about the instructions but that she did not enforce the rules about who to solicit. (Draughn Dep. p. 86, 90-91)

4

At the end of February 2004, Zanes was rotated from his post at the Taj Mahal to a post at the Trump Plaza. (Stmnt of Undisp. Facts, ¶ 5) According to Zanes, the move was an undesirable change in his employment conditions because it was commonly known among the CMPs and Fairfield management that CMPs stationed at the Taj Mahal had the highest success rate with attracting qualified consumers. (Zanes Dep. p. 50-51)

Approximately three months later, in May, Walker received from the Trump organization a copy of an e-mail complaint which Defendants assert led to Zanes' termination. A patron of the Plaza casino e-mailed the Trump Plaza stating that a "representative of a timeshare company" gave her and her husband a "pitch" which included a "story" about "a black woman . . . who cheated the system." (Walker Cert. Ex. A) The patron said she found the story particularly offensive because she is "biracial." (Id.) Trying to identify the employee who made the comments, she stated, "I believe his name was Bob. He was working in your casino last Saturday afternoon." (Id.)[7]

Zanes denies that he was the employee identified in the e-mail, although the Fairfield schedule for that day indicates that Zanes was the only male employee working at that location in the Plaza the entire day. (Bessinger Cert. Ex. I; Draughn Dep. p. 31-34)

---

[7] The parties do not dispute that the Saturday referred to is May 8, 2004.

5

According to Walker, "a Vice President of Trump" faxed him a copy of the e-mail complaint on May 14, 2004.  (Walker Cert. ¶ 3, 5)  After reading the e-mail, determining that Zanes was the only male employee working at that location on that date, and examining Zanes' personnel file,[8] Walker decided to fire Zanes.  (Id. at ¶ 5)

Zanes testified that on May 14, 2004, he was called into his immediate supervisor's office and told, "'Mike Walker is terminating you.'" (Zanes Dep. p. 130, 134)  When Zanes asked why he was being fired, he was told about the e-mail complaint.  (Id. at 134)

This suit followed.  Zanes' Amended Complaint primarily asserts retaliatory discharge claims under New Jersey's Conscientious Employee Protection Act ("CEPA") (Count 1) and New Jersey's Law Against Discrimination ("LAD") (Count 4).  In addition to these claims, the Amended Complaint also asserts claims of defamation (Counts 2 and 5),[9] and vicarious liability of Defendants Fairfield and Cendant for the allegedly wrongful actions of Zanes'

---

[8] Zanes' personnel file contained two routine employee evaluation forms and two disciplinary notices.  (Bissinger Cert. Exs. E-H)  None of these documents refer to any other incident of alleged racial comments.  One of the disciplinary notices resulted from Zanes allegedly taking a longer break than company policy allows.  (Id. Ex. G)  The other notice resulted from Zanes allegedly misrepresenting the relationship between Trump and Fairfield.  (Id. Ex. E)  While Zanes does not dispute that he was disciplined, he denies that he took an extended break or misrepresented the relationship between Trump and Fairfield.

[9] Count 2 is untitled but alleges Defendants' "communication of job information of a defamatory nature" which was "intentional, reckless or negligent."  Count 5 is entitled "Defamation," and asserts that "All statements as to plaintiff's survey problems or alleged racial hatred at Trump Plaza were false and defamatory per se."

supervisors (Count 3).[10]

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'"  *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).  The role of the Court is not "to weigh the evidence and determine the truth

---

[10] Counts Six and Seven of the Amended Complaint, respectively, assert liability against John Does 1-10 and ABC Corporations & Partnerships 1-10.
Defendants move for summary judgment on what they interpret to be an emotional distress claim, however, the Court does not interpret the Amended Complaint to assert such a claim, even under a liberal reading.  Moreover, Zanes' own statement of his claims does not identify an emotional distress claim.  (See Opposition Br. p. 1)

7

of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### III.

### A.

Defendants move for summary judgment on the CEPA claim, asserting that Zanes has failed to adduce sufficient evidence to support a *prima facie* claim of retaliation. Defendants further argue that Zanes cannot establish that Defendants' proffered reason for the adverse employment action was pretext for retaliatory motive. The Court disagrees.

CEPA provides,

> An employer shall not take any retaliatory action against an employee because the employee does any of the following: . . . c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law.

N.J.S.A. 34:19-3(c)(1).

The familiar burden-shifting framework applies to CEPA retaliation claims: A plaintiff must establish a *prima facie* case; then the burden shifts to the employer to provide a legitimate non-retaliatory reason for the adverse employment action[11]; then the

---

[11] CEPA prohibits "retaliatory action" which is defined as "discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e).

8

burden shifts back to the plaintiff to demonstrate that the non-retaliatory reason was pretext for a prohibited reason.  *See Fleming v. Correctional Healthcare Solutions, Inc.,* 164 N.J. 90, 100 (2000).  To establish a *prima facie* case of retaliation under CEPA, Zanes must establish (1) his reasonable belief that his employer's conduct violated a law, rule, or regulation; (2) a whistle-blowing activity; (3) an adverse employment action; and (4) a causal connection between her whistle-blowing activity and the adverse employment action. *See Caver v. The City of Trenton*, 420 F.3d 243, 254 (3d Cir. 2005); *Dzwonar v. McDevitt*, 177 N.J. 451, 462 (2003).  Defendants expressly do not dispute factors (1) and (2).  (Def. Br. at p. 14, n.7)

Adverse Employment Action

Zanes asserts two adverse employment actions: his transfer from the Taj Mahal station to the Plaza station, and his termination.  Defendants do not dispute that termination is an adverse employment action,[12] but they do dispute that Zanes' transfer was an adverse action, arguing that Zanes' transfer did not alter any terms of his employment, including his compensation structure or duties.

To the extent that Zanes asserts that his transfer was part of

---

[12] *See supra*, note 11, CEPA's definition of "retaliatory action" specifically includes "discharge."

9

a larger hostile environment created by Defendants in retaliation for his asserted protected conduct, it may constitute an adverse employment action under CEPA.  *Green v. Jersey City Bd. of Educ.*, explains,

> "Retaliation," as defined by CEPA, need not be a single discrete action.  Indeed, "adverse employment action taken against an employee in the terms and conditions of employment," N.J.S.A. 34:19-2e, can include . . . many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct.

177 N.J. 434, 445 (2003).  Zanes asserts that his transfer, and the allegedly meritless disciplinary actions taken against him, were all prompted by his complaints about Fairfield's marketing practices.  Whether or not Zanes' transfer actually resulted in a pay decrease,[13] Zanes has put forth evidence that he, as well as other CMPs, preferred working at the Taj Mahal.  Thus, a reasonable factfinder could conclude that the transfer was a hostile action insofar as it deprived Zanes of a preferred post.  The undesirable transfer and the allegedly meritless discipline, combined, could support a conclusion that Defendants created a hostile environment

---

[13]  Zanes' argument appears to be that he was transferred to a post where overall success rates for CMPs were lower.  Because Zanes, like all CMP's ("Commission Marketing Professionals"), was paid commissions (Zanes Dep. at p. 33), such a transfer could constructively amount to a reduction in pay, which would be an adverse employment action.  *See Caver v. City of Trenton*, 420 F.3d 243, 255 (3d Cir. 2005)(observing that New Jersey courts have interpreted CEPA's definition of "retaliatory action" to include actions impacting compensation).  However, the record does not establish whether Zanes actually made less money as a result of his transfer.  Indeed, Defendants argue that Zanes' made *more* money, although Defendants' proof in that regard is not clear.

10

sufficient to constitute adverse employment action under *Green*.

Causal Connection

Circumstantial evidence may be used to prove causation. "[T]emporal proximity between the employee's [protected conduct] and the adverse employment action or a 'pattern of antagonism' on the part of the employer following the protected expression can raise the inference of causation." *Espinosa v. County of Union*, 212 F. App'x 146, 153 (3d Cir. 2007). Considering the record as a whole, Zanes' evidence of antagonism and temporal proximity could reasonably support a finding of causation.

Zanes testified that he complained about the allegedly discriminatory marketing practices at training meetings, "[e]ither at the end of 2003 or the beginning of 2004, in that middle." (Zanes Dep. p. 161)  Before that time, Zanes had not been the subject of any disciplinary action. After that time, he received two written disciplinary notices in the span of approximately one month.[14] Shortly after the two written notices were issued, at the end of February, 2004, Zanes was transferred to the Plaza. (Stmnt of Undisp. Facts ¶ 5)  Approximately one month after Zanes was transferred, on March 14, 2004, he was fired. Thus, the evidence,

---

[14] Importantly, the Court is construing the record in the light most favorable to Zanes in this regard. Based on Zanes' testimony that he complained "at the end of 2003," both written notices, dated December 9, 2003, and January 16, 2004, (Bissinger Exs. E, G) quickly followed.

11

viewed in the light most favorable to Zanes, could lead a reasonable factfinder to find that Zanes' complaints triggered several antagonistic actions by Defendants that followed in relatively rapid succession. Such a finding would be sufficient to establish the requisite causal connection element of Zanes' *prima facie* case.

Pretext

Defendants assert that even if Zanes can establish a *prima facie* claim under CEPA, his claim must nevertheless fail because the record evidence cannot establish that the reasons for their actions were pretextual. The issue is whether

> plaintiff has offered sufficient evidence for a reasonable jury to find that the employer's proffered reason for the discharge was pretextual and that retaliation for the whistleblowing was the real reason for the discharge. Typically, the types of evidence that the plaintiff must point to are inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons.

*Blackburn v. UPS, Inc.*, 179 F.3d 81, 93 (3d Cir. 1999)(internal citations and quotations omitted).

Defendants have put forth a legitimate non-retaliatory reason for terminating Zanes: the e-mail complaint by a Plaza patron.[15]

---

[15] Defendants do not focus much attention on the reasons for the other alleged hostile actions (i.e., the disciplinary notices and transfer) that cumulatively amount to adverse employment action. Issues of disputed fact exist which preclude summary judgment on the issue of pretext. With respect to the disciplinary notices, Defendants assert that Zanes actually committed the violations for which he was punished, while Zanes denies that he did. With respect to Zanes' transfer, Defendants claim that all employees were

Zanes asserts that his employer's failure to investigate the complaint is evidence of pretext.  Indeed, the undisputed record shows that Zanes was fired on the same day the complaint came to Defendant Walker's attention, and that Zanes was summarily fired without an opportunity to deny, explain, or otherwise respond to the allegations.  While nothing in the record suggests that firing Zanes without giving him an opportunity to be heard was a violation of company policy or practice,[16] the abrupt nature of Zanes' termination could be found to be somewhat anomalous.

Walker states that he looked at Zanes' employment file before deciding to terminate him.  (Walker Cert. ¶ 5)  Although the file contained two recent disciplinary notices, neither notice resulted from any alleged racist comment or other actions of similar severity.[17]  Construing these facts in the light most favorable to Zanes, a reasonable factfinder could conclude that immediately terminating Zanes was a disproportionate reaction to the situation, thereby suggesting that the termination was pretextual.  *Cf. Grazioli v. Genuine Parts Co.,* 409 F. Supp. 2d 569, 583 (D.N.J.

---

routinely rotated, and that Zanes' "rotation" to the Plaza was merely part of a larger rotation of several employees.  Zanes disputes that there was no retaliatory motive behind his rotation.

[16]   While Fairfield's Employee Handbook sets out a four step disciplinary progression, the handbook says nothing about procedures that must be followed before an employee is terminated.  The handbook states, "Fairfield may terminate the employment relationship at will at any time, with or without notice or cause, so long as there is no violation of applicable federal or state law."  (Van Syoc Cert. Ex. 1)

[17]   *See supra,* note 8.

13

2005)(Irenas, S.J.) ("The unusual speed with which the investigation occurred, including the fact that no one asked [plaintiff] for her side of the story before concluding that her actions warranted termination, raises questions about [defendant's] proffered reason for termination."). Such a conclusion is further supported by the climate of antagonism within which Zanes' termination occurred. *See supra* p. 11, discussion of causal connection.

Accordingly, the Court holds that Zanes has put forth sufficient evidence to support a finding of pretext and to support a *prima facie* case of retaliation under CEPA. Defendants' Motion for Summary Judgment on the CEPA claim will be denied.

**B.**

Defendants assert that CEPA's waiver provision precludes Zanes' LAD claim as a matter of law. The Court agrees.

CEPA's waiver provision states,

> Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.

N.J.S.A. 34:19-8.

In *Young v. Schering Corp.*, the New Jersey Supreme Court

14


rejected a literal reading of the waiver provision, which would force employees to "choose between a CEPA claim and other legitimate claims that are substantially, if not totally, independent of the retaliatory discharge claim."  141 N.J. 16, 25 (1995).  Instead, the Court held,

> the wavier exception means, for purposes of this case, that once a CEPA claims is 'instituted,' any rights or claims for *retaliatory discharge* based on a contract of employment; collective bargaining agreement; State law, whether its origin is the Legislature, the courts, the common law rule of court; or regulations or decision based on statutory authority, are all waived.

*Id.* at 29 (emphasis added).  Thus, only plaintiff's claims that required a finding of retaliatory discharge were precluded by CEPA.  *Id.*  Claims that "'d[id] not resemble the alleged CEPA violations and require[d] different proofs than those needed to substantiate a CEPA claim'" were allowed to proceed.  *Id.* at 31.

Here, it is clear that Zanes asserts a retaliatory discharge claim under the LAD.  He claims that he was subjected to a hostile work environment and then abruptly fired in retaliation for opposing discriminatory marketing practices prohibited by LAD.  Thus, his LAD claim closely resembles, and does not require different proofs from, his CEPA claim. *See Bowen v. Parking Auth. of Camden,* No. 00-5765, 2003 WL 22145814, at *23 (D.N.J. Sept. 18, 2003)(Simandle, J.) (dismissing LAD claim as waived by the pursuit of CEPA claim because "'blowing the whistle' on discrimination [under LAD] is 'blowing the whistle' on a 'practice in violation of

15

law' [under CEPA]."). Accordingly, summary judgment is warranted on the LAD claim.

c.

Defendants further argue that Defendant Walker is entitled to judgment in his favor on the CEPA claim because CEPA does not provide for individual liability of supervisors.  In so arguing, Defendants exclusively rely on *Ecker v. Dana Transport Systems, Inc. et al.,* which, admittedly, does hold that supervisors are not subject to individual liability under CEPA. 2006 WL 740468 at *2 (N.J. Sup. Ct. 2006).  However, the substantial weight of authority, indeed *all* other authority (none of which Defendants cite, much less distinguish), is to the contrary.[18]  This Court agrees with Judge Hillman's rejection of *Ecker* in favor of "the rule as stated by the Third Circuit in *Fasano* and the reasoning in *Palladino*" which provides for individual liability under CEPA. *Gunnings v. Borough of Woodlynne*, No. 05-5459, 2007 WL 4591290 at *13 (D.N.J. Dec. 28, 2007).  Accordingly, Defendant Walker's Motion

---

[18] *See Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 289 (3d Cir. 2000); *Dewelt v. Measurement Specialties, Inc.*, No. 02-3431, 2007 U.S. Dist. LEXIS 11373 at *20-26 (D.N.J. Feb. 15, 2007); *Espinosa v. County of Union*, No. 01-3655, 2005 U.S. Dist. LEXIS 36563 at *31 (D.N.J. Aug. 30, 2005), *aff'd by* 212 Fed. Appx. 146 (3d Cir. 2007); *English v. Misys Int'l Banking Sys.*, No. 05-2540, 2005 U.S. Dist. LEXIS 29474 at *11-12 (D.N.J. July 20, 2005); *Sunkett v. Misci, Jr.*, 183 F. Supp. 2d 691, 716 n.12 (D.N.J. 2002); *Bowen v. Parking Authority of Camden*, No. 00-5765, 2003 WL 22145814 at *22 (D.N.J. Sept. 18, 2003); *Maw v. advanced Clinical Comm., Inc.,* 359 N.J. Super. 420, 439-40 (App. Div. 2003), *rev. on other grounds by* 179 N.J. 439 (2004); *Palladino v. VNA of Southern N.J., Inc.*, 68 F. Supp. 2d 455, 473-74 (D.N.J. 1999).

for Summary Judgment as to the CEPA claim will be denied.

### D.

Defendant Cendant Corporation moves for summary judgment on all claims against it, asserting that it was not Zanes' employer. Cendant submits the certification of Fairfield's[19] Area Vice President for Human Resources who states that Cendant and Fairfield were two separate corporate entities, and that "Zanes was employed solely by Fairfield, and not by . . . Cendant Corporation." (Masticola Cert. ¶ 2)  However Defendants' own documents raise material questions of fact as to whether Cendant employed Zanes. The name "Cendant Corporation" appears at the top of each page of Zanes' payroll documents.  (Masticola Cert. Ex. B)  Defendants give no explanation for this fact.  Accordingly, summary judgment must be denied.

### E.

Lastly, summary judgment will be granted on the defamation claim.  The contours of Zanes' defamation claim are less than clear.  Indeed, Zanes' opposition brief makes no argument with

---

[19] Since the time Zanes filed this suit, Fairfield Resorts, Inc. is "now known as Wyndham Vacation Resorts, Inc." (Masticola Cert. ¶ 2)

17

regard to the defamation claim.[20]  The Amended Complaint asserts, "[a]ll statements as to plaintiff's survey problems or alleged racial hatred at Trump Plaza were false and defamatory *per se*." (Amend. Compl. p. 8)

"In addition to alleging defamatory statements, the complaint must plead facts sufficient to identify the defamer and the circumstances of publication." *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 767-68 (1989).

On the present record, the Court cannot ascertain what "survey problems" the Amended Complaint references.  Nor is it clear who Zanes asserts made the allegedly defamatory statements[21] or when the statements were made.  In short, the defamation claim might not have survived a motion to dismiss (had one been made) and it surely cannot survive this motion for summary judgment.  The record fails to sufficiently establish the circumstances of publication, nor does it establish special damages.  *See Ward v. Zelikovsky,* 136 N.J. 516, 540 (1994)("To succeed in an action for slander, the plaintiff must demonstrate actual harm to reputation through the

---

[20] Zanes' opposition only addresses his NJ LAD and CEPA claims. Defendants argue that summary judgment should be granted on all other claims for lack of opposition.  However, the defamation claim clearly fails on the merits, and therefore will be dismissed on the merits.

[21] The Court does not decide whether the vague statements, as alleged in the Amended Complaint, are capable of defamatory meaning.

production of concrete proof.").[22]

Accordingly, Defendants are entitled to summary judgment on the defamation claim.

**IV.**

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment.  The CEPA claim will remain against all Defendants, but all other claims will be dismissed.  An appropriate order will be issued.

Dated: July 17, 2008

                                                        s/ Joseph E. Irenas
                                           **Joseph E. Irenas, S.U.S.D.J.**

---

[22]  Indeed, Zanes' own argument undermines a conclusion that his reputation was harmed.  Zanes contends that his co-workers could not believe that he would be accused of being a racist because everyone knew he was not.  (*See* Plaintiff's Counter-Statement of Undisputed Facts ¶ 31, "Plaintiff spoke with several of his co-workers, who were African American, who likewise confirmed that plaintiff would never say a racially charged comment as alleged in the e-mail.").

19